#### IN THE UNITED STATES DISTRICT COURT

#### FOR THE DISTRICT OF NEW MEXICO

**KEVIN DICKINSON and**
**TROY SHAW,**

    **Plaintiffs,**

vs.                                      Cause No.  1:06-cv-931 MCA/DJS

**CANTEEN CORRECTIONAL**
**SERVICES, INC., et al.,**

    **Defendants.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

By *Order of Reference Relating to Bankruptcy Appeals, Social Security Appeals, and Prisoner Cases* [Doc. 5], entered October 4, 2006, this matter was referred to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case.  For the reasons stated below, the Court recommends *Defendants Correctional Medical Services, Inc. and William Shannon's Renewed Motion for Summary Judgment as to Plaintiff Kevin Dickinson's Sixth Cause of Action* [Doc. 277], filed August 13, 2010, be **GRANTED**.

**I.     BACKGROUND**

Plaintiff Kevin Dickinson is a *pro se* litigant.[2]  Together with Plaintiff Troy Shaw, Dickinson brought this civil rights action against numerous defendants alleging that various of his

---

[1] Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2] Dickinson was represented by counsel for a time, but his counsel was allowed to withdraw on September 27, 2010.  [Doc. 290.]  Because an attorney did not enter an appearance within twenty days thereafter, Dickinson is now considered to be *pro se*.  [Id.]

constitutional rights were violated while he was incarcerated at the Bernalillo County Metropolitan Detention Center ("MDC").

Two of the defendants, Correctional Medical Services, Inc. ("CMS") and Dr. William Shannon jointly moved for summary judgment as to all counts against them. [Doc. 222.] On March 18, 2010, the motion was granted except as to a portion of Dickinson's sixth cause of action. [Doc. 272.] To the extent the sixth cause of action asserted a claim that Dickinson was denied necessary medical and psychological care and treatment, summary judgment was denied and the case was stayed for a period of ninety days to permit Dickinson to engage in certain limited discovery. [Id. at 2.] In the Memorandum Opinion and Order denying summary judgement as to the sixth cause of action, the District Judge granted CMS and Dr. Shannon leave to renew their motion for summary judgment with respect to the remaining portion of the sixth cause of action following the expiration of the ninety day period. [Id.]

The ninety day period expired on June 18, 2010. Dickinson was represented by counsel throughout the ninety day period and did not, as far as the record reflects, undertake any discovery. On August 13, 2010, CMS and Dr. Shannon renewed their motion for summary judgment as to the remainder of the sixth cause of action. [Doc. 277.] Dickinson has not filed a response to the motion nor has he requested an extension of time to respond.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories,

admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its burden, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be "merely colorable" or anything short of "significantly probative." *Anderson*, 477 U.S. at 249.

The Court liberally construes the filings Dickinson made while *pro se*. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Furthermore, although permitted by Local Rule D.N.M.LR-Civ. 7.1(b), the Court does not, under the circumstances here, construe Dickinson's failure to respond to the motion as consent to grant it. *See Meade v. Grubbs*, 841 F.2d 1512, 1520 (10th Cir. 1988). The Court will instead assume that the motion is opposed and address the merits. All material facts set forth in the Defendants' motion are deemed admitted due to Dickinson's failure to controvert them. D.N.M.LR-Civ. 56.1(b).

  **B.**  **Deliberate Indifference to Serious Medical Need**

Liberally construed, Dickinson's remaining claims against CMS and Dr. Shannon assert they violated his Eighth Amendment rights by denying him medical treatment for various ailments. [Doc. 8, ¶¶ 132–85 (Sixth Cause of Action).] A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and quotation marks omitted). "'Deliberate indifference' involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component is met if the

deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citation and quotation marks omitted).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Sealock*, 218 F.3d at 1209 (citation and quotation marks omitted). "In measuring a prison official's state of mind, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quotation marks and citation omitted). Accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment. *Estelle*, 429 U.S. at 105–06. The subjective element of an Eighth Amendment claim is not satisfied "absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

Accordingly, to establish an Eighth Amendment claim that CMS and Dr. Shannon were deliberately indifferent to his medical needs, Dickinson must demonstrate: (1) he suffered objectively serious medical needs; and (2) the Defendants actually knew of and deliberately disregarded those needs. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (two-pronged standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious"). "[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis and treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Id.*

Bearing these standards in mind, the Court turns to the merits.

4

## III.    ANALYSIS

Liberally construing the amended complaint's Sixth Cause of Action [Doc. 8, ¶¶ 132–85], the Court discerns ten discrete harms. Specifically, Dickinson claims CMS and Dr. Shannon: (1) failed to treat a broken pinky finger; (2) failed to test him for hepatitis, HIV, and sexually-transmitted diseases; (3) failed to treat his hepatitis C; (4) failed to properly treat various pulmonary disorders; (5) aggravated an alleged wool allergy by failing to issue non-wool blankets; (6) provided inadequate treatment for back problems and arthritis; (7) failed to treat his attention deficit disorder; (8) failed to adequately treat a skin disorder; (9) required him to sometimes pay for medical care; and (10) caused him to miss dosages of medication when he was using the law library.

The list of facts deemed admitted due to Dickinson's failure to controvert them is lengthy [Doc. 278 at 2–18] and the Court will not list them all. The Court will instead cite to the material facts as they become relevant to the analysis.

### A.    Broken pinky finger

Dickinson claims he broke his right pinky finger "in such a way that the end of the finger sticks out at a crooked angle." [Doc. 8, ¶ 136.] He alleges CMS and Dr. Shannon refused for over a month to x-ray the finger, that they did not set the broken bone, and that he has lost much of his use of that finger as a result. [Id., ¶¶ 137–39.]

The following facts regarding this claim are uncontroverted. Dickinson was seen on October 21, 2004, after an altercation and complaining of right hand finger pain. [Doc. 278, ¶ 12.] A minimal amount of deformity and swelling of the fifth finger were observed and noted. [Id., ¶ 12.] The medical record for this incident further states: "neurovascular checks okay as evidenced by capillary refills < 25 seconds, color pink, skin warm." [Doc. 278-2 at 10.] An x-ray of the finger was taken on October 24, 2004. [Doc. 278, ¶ 14.] The findings were: "Avulsion fracture of the

5

distal phalanx at the DIP joint. No significant displacement." [Id.] Dr. Shannon reviewed the x-ray report on November 23, 2004. [Id., ¶ 16.]

Dickinson has failed to come forth with evidence that satisfies either the objective or subjective prong of the deliberate indifference test. Regarding the objective element, there is no evidence that an avulsion fracture of the fifth finger, without displacement, is a serious medical need or that it requires treatment. *See Maxey v. Astorga*, No. 93-16952, 1994 WL 328212, *1 (9th Cir. July 6, 1994) (unpublished) (affirming summary judgment on prisoner's Eighth Amendment claim because minor avulsion fractures of the finger typically heal naturally and do not require medical treatment).

Regarding the subjective element, there is no evidence that Defendants knew of and disregarded a serious risk to Dickinson's health. It is undisputed that Dickinson was examined shortly after he sustained the fracture and that the finger was x-rayed within four days. Defendants' alleged "failure" to set the broken bone, as Dickinson claims should have been done was malpractice at worst, and may have been appropriate under the circumstances. It does not constitute an Eighth Amendment violation. Defendants are therefore entitled to summary judgment on this claim.

**B.     Failure to test for HIV, hepatitis, and sexually transmitted diseases ("STDs")**

Dickinson claims Defendants failed to test him for HIV, hepatitis, and STDs because of the cost of treating those conditions. [Doc. 8, ¶ 145.] He also states he requested HIV and STD testing beginning in August 2004 when he first entered MDC, but was not tested until October 2006. [Doc. 244-1, ¶ 33.]

The following facts are uncontroverted. Dickinson tested positive for hepatitis C in 1998 and was known to have the disease upon intake to MDC in August 2004. [Doc. 244-1, ¶ 34.] He tested positive for HIV in October 2006, while incarcerated at MDC. [Doc. 278, ¶ 80; Doc. 278-3

6

at 14.] Dr. Shannon ordered additional tests to evaluate Dickinson's prognosis immediately upon learning he was HIV positive. [Doc. 278, ¶¶ 80, 81.] In February 2007, Dr. Shannon referred Dickinson to UNMH-Truman Street Health Services due to his recent diagnosis of HIV. [Id., ¶ 99.] Dickinson was seen at the UNMH-Truman Street Health Services on February 27, 2007, where it was noted he was asymptomatic for HIV and was awaiting additional laboratory testing. [Id., ¶ 103.] He was seen again at the UNMH-Truman Street Health Services for assessment and treatment of HIV on March 28, 2007. [Id., ¶ 107]. He transferred out of MDC in April 2007. [Id., ¶ 115.]

The Court assumes for purposes of this motion that hepatitis, HIV, and STDs are serious medical needs. At issue with respect to this claim, however, is not Defendants' treatment of these conditions, but their alleged failure to test for them.

Regarding hepatitis C, Dickinson was known to have the disease upon intake, thus there was no need to test for it. Regarding HIV and STDs, Dickinson was tested about two years after his arrival at MDC. Viewing the facts in the light most favorable to Dickinson, the Court assumes he requested testing on multiple occasions. The Court is not aware, however, of any authority supporting the proposition that he was constitutionally entitled to HIV and STD testing upon demand. Instead, the Court must look to whether the need for testing was obvious and whether Defendants were aware of the need. *See Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).

There is no evidence that Dickinson displayed symptoms or signs, or that there were obvious indications of the need for HIV or STD testing. Thus, the failure to test for HIV or STDs may, under these circumstances, constitute negligence, but it does not rise to the level of a constitutional violation. Accordingly, Defendants are entitled to summary judgment on this claim.

    **C.**    **Refusal to treat Hepatitis C**

Dickinson claims Defendants failed to treat his hepatitis C. [Doc. 8, ¶ 146.] The medical

records Defendants submitted do not reflect whether they provided any treatment for this condition. Viewing the facts in the light most favorable to Dickinson, the Court assumes Defendants were aware that Dickinson has hepatitis C and that they provided no treatment for it. The Court nevertheless concludes they are entitled to summary judgment on this claim.

To begin, even if the Court were to assume that hepatitis C is a serious medical condition, there is no evidence Defendants were deliberately indifferent to the condition. The Tenth Circuit has observed that treatment is not required in every case of hepatitis C, and that the failure to provide treatment for hepatitis C does not necessarily give rise to a claim for deliberate indifference. *Free v. Unknown Officers of Bureau of Prisons*, 103 F.App'x 334, 336–37 (10th Cir. 2004) (unpublished). Here, there is an absence of evidence that Dickinson manifested symptoms, that he complained of symptoms, that treatment would have been effective or that it was necessary in his case. There also is no evidence that Dickinson suffered any harm from Defendants' alleged failure to treat. The Court therefore concludes summary judgment on this claim is appropriate.

### D. Failure to treat various pulmonary disorders

Dickinson suffers from Chronic Obstructive Pulmonary disease ("COPD"), allergies, asthma, and emphysema. He claims Defendants failed to treat these pulmonary conditions properly. Specifically, he claims they repeatedly allowed his prescriptions to expire, stopped prescribing pseudoephedrine for treatment of COPD, refused to prescribe Singulair, and forced him to use an Albuterol inhaler instead to relieve his asthma and emphysema symptoms. [Doc. 8, ¶¶ 147–54.] As a result of the allegedly inadequate treatment, Dickinson claims his COPD and allergies have worsened, he suffered asthma attacks, he has difficulty breathing, was unable to exercise, and gained weight because of his sedentary lifestyle at MDC. [Id., ¶¶ 149, 154.]

The Court assumes for purposes of this motion that Dickinson's pulmonary disorders

collectively constitute a serious medical need. Defendants are nevertheless entitled to summary judgment because the uncontroverted facts demonstrate they were not deliberately indifferent, but afforded treatment and medication on multiple occasions.

The record reflects that Dickinson was seen by a medical professional in connection with his various pulmonary ailments no fewer than sixteen times between August 2004 when he entered MDC to April 2007 when he was transferred from MDC.[3] [Doc. 278, ¶¶ 5, 8, 10, 13, 28, 44, 61, 63, 64, 67, 71, 73, 75, 90, 102, 104.] He was prescribed or given numerous medications and treatments including Albuterol, Sudafed, nebulizer treatments, and Flovent. [Id., ¶¶ 4, 6, 44.] The Court discerns nothing from the record that indicates Defendants disregarded Dickinson's need for treatment. To the contrary, the uncontroverted facts show they provided treatment on a continuing basis throughout the time of his confinement at MDC. Dickinson's disagreement with the treatment he received, or Defendants' alleged refusal to prescribe his preferred medication, does not constitute an Eighth Amendment violation.

Furthermore, assuming as Dickinson alleges that prescriptions lapsed causing a delay in receiving medications, in light of the sheer number of appointments and the volume of medical records relating to treatment of pulmonary disorders, it appears that lapsed prescriptions, if any, were merely the result of inadvertence or simple neglect. The Court accordingly concludes that Defendants are entitled to summary judgment on this claim.

### E.     Failure to issue non-wool blankets

Dickinson claims he is allergic to wool and that the wool blankets issued at MDC shed "fuzz" which aggravates his allergies and COPD. [Doc. 8, ¶¶ 155–57.] He complains that Defendants refused

---

[3] Dickinson was not housed at MDC between February 7, 2006 and June 15, 2006. [Doc. 278, ¶ 69.]

to issue him a non-wool blanket or to require the other prisoners housed in his cell block to use non-wool blankets. [Id., ¶¶ 158–59.]

This claim fails both prongs of an Eighth Amendment claim. A serious medical need is one that has been diagnosed by a physician or is obvious to the lay person. *Sealock*, 218 F.3d at 1209. Here, there is no evidence that Dickinson is in fact allergic to wool. Although he claims he has an allergy to wool, there is no evidence he has been diagnosed with such. Furthermore, given that Dickinson suffers from a variety of unspecified allergies, there is nothing in the record from which the Court can reasonably infer that any alleged allergic reaction he suffered was caused by wool blankets. And even if the Court were to assume that Dickinson is allergic to wool, there is no evidence that an allergy to wool is a serious medical need.

Regarding the subjective element, there is an absence of evidence that Defendants were indifferent to his alleged allergy. The undisputed fact is that Dickinson was given a cotton blanket on February 6, 2007. [Doc. 278, ¶ 98.] Dickinson has failed to establish a genuine issue of material fact and Defendants are therefore entitled to summary judgment on this claim.

### F.      Inadequate treatment for back problems and arthritis

Dickinson claims he suffers from back pain and arthritis. He complains that Defendants did not timely provide him with pain medications, a cane, or back brace. [Doc. 8, ¶¶ 161–64.] The delay in receiving these items, according to Dickinson, is due to a number of factors: CMS's employees allow prescriptions to expire, fail to order prescriptions and other items, fail to deliver them to him if they are ordered, and fail to ensure the items are timely delivered if he is moved to a different cell block. [Id., ¶¶ 161–65.] He also attributes delay to the infrequent schedule of "sick calls" and CMS's policy of charging for prescription renewal which in turn causes his prescriptions to expire. [Id., ¶¶ 166–69.] He further complains of one incident in November 2004 when he collapsed due to back pain,

was unable to get up, and "was left lying on the floor of a common area in his cell block for several hours...because Defendants CMS and Shannon [were] not on-site to examine [him]." [Id., ¶ 172.]

The uncontroverted facts establish the following regarding Dickinson's back and arthritis issues. A medical screening noted that Dickinson had arthritis upon intake on August 13, 2004. [Doc. 278, ¶ 2.] Dickinson was seen by Dr. Shannon or other medical professional for back pain issues on October 21, 2004, November 18, 2004, August 2, 2005, and October 12, 2005. [Id., ¶¶ 11, 15, 29.] On the first two of these occasions, on August 24, 2005, and on October 12, 2005, he was noted to be taking, or was prescribed pain killers (Ibuprofen, Motrin). [Id., ¶¶ 11, 15, 37, 56.] On August 29, 2005, Dr. Shannon received a radiology report for a lumbar spine examination conducted on August 17, 2005; the report revealed a normal lumbar spine. [Id., ¶ 42.] Also on August 29, 2005, Dr. Shannon received the radiology report for the complete lumbar spine series conducted on August 20, 2005; the report revealed no significant abnormality of the spine. [Id., ¶ 43.] On November 16, 2005, 2005, a Dr. McMurray ordered a cane be provided to Dickinson to keep on his person. [Id., ¶ 59.] On September 12, 2006, a cane was issued to Dickinson. [Id., ¶ 76.] On December 13, 2006, Dr. McMurray provided written authorization for Dickinson to keep a cane in his possession. [Id., ¶ 92.]

Regarding the November 2004 incident when Dickinson was allegedly left to lie on the floor after collapsing, the uncontroverted facts reflect the following: On November 29, 2004, medical staff members responded to an emergency call after it was reported that Dickinson's legs "gave out." [Doc. 278, ¶ 42.] There was no sign of trauma, but Dickinson claimed he was unable to walk and experiencing leg spasms. [Id.] He was not cooperative and only wanted transport to the hospital. [Doc. 278-2 at 14.] He became upset and stated he was going to stab someone. [Id.] Medical personnel then "cleared the scene" and treatment was deferred. [Id. at 14, 15.] Dickinson was scheduled to see Dr. Shannon on December 6, 2004, but missed the appointment because he was in

11

court. [Id. at 16.]

Based on the uncontroverted facts, the Court cannot conclude the back and arthritis problems constitute an objectively serious medical need. Examinations of his lumbar spine indicate that the spine is free of abnormality. Although he has been diagnosed with arthritis, there is an absence of evidence regarding the nature and severity of the arthritis. Furthermore, the record is silent as to the reason Dickinson's legs "gave out" in November 2004. There is no evidence from which the Court could conclude the occurrence was serious. Dickinson remained at MDC for over two years after the incident, and as far as the Court is aware, the incident is not mentioned again in the record. Dickinson was in court a week after the incident, and in the month following the incident he missed three other medical appointments for various reasons, including to access the law library and because he had a migraine. [Doc. 278, ¶¶ 19–22.] The inference to be drawn from this series of events is that the incident was not serious and did not result in any lasting harm or physical disability. The Court therefore concludes the objective element has not been met.

Even if the Court were to assume the objective element has been met, there is no evidence that Defendants acted with a subjectively culpable state of mind. The record reflects that Dickinson was seen for his back pain on numerous occasions, x-rayed, prescribed or taking medication, and given a cane. Dickinson's primary complaint appears to be that Defendants did not act quickly enough in providing him with pain medication or devices. However, he has failed to show that the alleged delay was due to anything other than inadvertence or negligence, or that the delay resulted in any injury. The record also shows that he was regularly receiving pain medication such as Ibuprofen and Motrin, despite any delays that may have occurred in delivery when he was moved from one cell block to another. Regarding the November 2004 incident, the undisputed facts indicate medical personnel responded to an emergency call, observed no trauma, and then "cleared the scene" because Dickinson

became upset and threatened violence.

Based on the undisputed facts, the Court concludes there is no genuine issue of material fact as to Dickinson's Eighth Amendment claim that Defendants were deliberately indifferent to his back and arthritis issues. Defendants are therefore entitled to summary judgment on this claim as a matter of law.

### G. Failure to treat Attention Deficit Disorder ("ADD")

Dickinson claims he suffers from ADD which was successfully treated with Ritalin for several years prior to his confinement at MDC. [Doc. 8, ¶ 174.] Additional elaboration on this claim is found in an affidavit Dickinson submitted to oppose an earlier motion. [Doc. 244-1.] He claims he suffers typical ADD symptoms such as an inability to stay focused, difficulty concentrating, disorganization, and trouble finishing projects. [Id., ¶ 23.] He further claims that Defendants refused to treat his ADD, and as a result, he was found incompetent to stand trial, deprived of the right to represent himself in criminal proceedings, and has had difficulty in pursuing this civil matter. [Doc. 8, ¶ 175.]

The medical records Defendants submitted do not reflect that Dickinson received any treatment or medication for ADD while he was incarcerated at MDC. The Court nevertheless concludes that summary judgment on this claim is appropriate.

First, other than Dickinson's self-reports, there is no medical evidence that he in fact suffers from ADD. Even assuming he has been diagnosed with ADD and was prescribed Ritalin before his incarceration at MDC, there is no evidence that his particular case of ADD constitutes a serious medical need. The symptoms he describes—inability to stay focused, difficulty concentrating, disorganization, and trouble finishing projects—fall far short of the harm necessary to state an Eighth Amendment claim. *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (stating that for claim to be cognizable under Eighth Amendment, prisoner must produce objective evidence that harm is

"sufficiently serious"). Further assuming Dickinson experienced more difficulty than he would had Defendants continued his alleged prescription for Ritalin, the docket in this case reflects Dickinson mustered sufficient focus and concentration to vigorously maintain this litigation *pro se* for over two years until an appearance of counsel on his behalf.[4] In sum, summary judgment should be granted because there is no evidence Dickinson has been diagnosed with ADD or that a lay person would recognize the need for treatment.

H.   **Failure to treat skin disorder**

Dickinson claims he suffers from a skin disorder that causes rashes to appear on his arms and feet and sores to appear all over his body. [Doc. 8, ¶ 177.] He claims Defendants failed to provide adequate treatment for the skin disorder, causing him constant pain, especially when wearing the "shower shoes MDC forces him to wear[.]" [Id, ¶ 178.] He also claims he has suffered nerve damage on the tops of his feet as a result of Defendants' alleged failure to treat the skin condition. [Id.]

The uncontroverted facts establish the following. Dickinson was evaluated upon intake on August 13, 2004 for a rash of unknown source on his left wrist and both feet and prescribed an antibiotic. [Doc. 278, ¶ 3.] He was diagnosed with impetigo on August 2, 2005 and prescribed "Hibiclens" and Band-Aids for treatment of the impetigo. [Id., ¶ 29.] On August 3, 2005, he was started on "Bactrim" to assist in resolution of the impetigo. [Id., ¶ 30.] On August 24, 2005, Dr.

---

[4]There also is an absence of evidence suggesting a causal link between Dickinson's alleged ADD and a finding of incompetence to stand trial. The Court takes judicial notice of another case Dickinson filed in this district in which he asserted a similar failure-to-treat claim. *See Dickinson v. Bagwell*, Cause No. 1:06-cv-257 MCA/LAM. In *Dickinson v. Bagwell*, Dickinson asserted that physicians at the New Mexico Behavioral Health Institute ("NMBHI") who treated him for various mental disorders after a state court judge found him incompetent to stand trial, also failed to treat his ADD. *See Dickinson v. Bagwell*, Cause No. 1:06-cv-257 MCA/LAM. Dickinson was treated at NMBHI for a period of four months in 2006 and was restored to competence in June 2006. *Dickinson v. Bagwell*, Cause No. 1:06-cv-257 MCA/LAM [Doc.110 (*Order Adopting Magistrate Judge's Proposed Findings and Recommended Disposition* (Doc. 99)) and [Doc. 99 at 9] *Proposed Findings and Recommended Disposition*]. Dickinson's return to competence, despite the NMBHI Defendants failure to treat his ADD suggests the period of incompetence was due to factors other than ADD.

Shannon ordered that Dickinson be prescribed Ibuprofen, that antibiotics be discontinued, and that the wounds be completely covered. Dr. Shannon also ordered a wound culture. [Id., ¶ 37.] The wound culture indicated no growth after 48 hours. [Id., ¶ 41.] The record further indicates Dickinson was seen at the wound care clinic no fewer than 25 times in the two-month period from August to September 2005. On October 1, 2005, it was determined that he no longer required wound care, per Dr. Shannon's orders. [Id., ¶ 53.]

Dickinson has failed to adduce evidence that Defendants disregarded his skin condition. To the contrary, the facts which Dickinson has failed to controvert establish that Defendants diagnosed his skin condition as impetigo and provided ongoing care and medication until Dr. Shannon determined care was no longer needed.

Based on the uncontroverted evidence provided by Defendants and Dickinson's failure to come forth with evidence of deliberate indifference, the Court concludes there is no genuine issue of material fact as to this claim and that Defendants are entitled to summary judgment as a matter of law.

**I.     Requirement to pay for medical care and treatment**

Dickinson alleges that CMS requires "prisoners to pay for medical care and treatment, and does not inform prisoners what medical treatments will not be charged." [Doc. 8, ¶ 134.] He claims he does not know if or when he will be charged and as a result he does not seek "medical attention for non-life-threatening issues he would normally seek treatment for[.]" [Id., ¶ 135.] He further alleges that CMS does not consider his indigency when it charges for medical care. [Id., ¶ 143.] The ailments he has not sought care for because of this alleged policy requiring payment include colds, flu, back injury, infected cuts, skin infections, and headaches. [Id., ¶ 144.]

"The Eighth Amendment prohibits prison officials from denying an inmate medical treatment due to a lack of funds or conditioning the provision of needed medical services upon an inmate's ability

15

to pay." *Cannon v. Mason*, 340 F.App'x 495, 498 (10th Cir. 2009) (unpublished) (citations omitted). However, the fact that a prison's policy may require inmates with adequate resources to pay a small cost for their health care is not unconstitutional. *Cannon*, 340 F.App'x at 499. Requiring a small payment does not constitute deliberate indifference, but "simply represents an insistence that the prisoner bear a personal expense the he or she can meet and would be required to meet in the outside world." *Cannon*, 340 F.App'x at 499 (quoting *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997)).

The payment policy Dickinson complains of is not of record. The Court is therefore unable to determine its parameters. Regardless of the nature of the policy, however, the Court concludes that summary judgment is due because there is no evidence Dickinson was ever denied care for a serious medical need on account of indigency. To the contrary, as discussed above, the record reflects he was a prodigious user of the prison medical facilities. Over a period of approximately 2½ years, Dickinson was seen by a medical professional for one ailment or another on more than 70 occasions.

Furthermore, to prevail on an Eighth Amendment claim, the medical need must be serious. The ailments Dickinson did not seek treatment for because of his alleged poverty he characterizes as "non-life-threatening." He admits he did pay a fee of $7.00 on at least one occasion in order to receive a sick call from a nurse. [Doc. 8, ¶ 171.] On another occasion he declined a sick call because he did not want to be charged the sick call co-pay. [Doc. 278, ¶ 26; doc. 278-2 at 24.] It thus appears that Dickinson exercised judgment regarding how to spend his available financial resources to obtain medical care for non-serious needs.

There is no evidence that Dickinson was denied care for an objectively serious medical need or that Defendants were deliberately indifferent to such a need through the practice of requiring Dickinson to pay for some medical services. Defendants are therefore entitled to judgment on this claim as a matter of law.

J.     **Missed medication doses when using the law library**

Finally, Dickinson contends he missed doses of his scheduled medication when he was using the law library. [Doc. 8, ¶¶ 140–42.] Medications he allegedly missed include analgesics, antibiotics, and allergy medications. [Id., ¶ 142.] Dickinson has not directed the Court to any evidence that indicates the number of missed doses or the specific effect on his health of the missed doses. This claim is thus devoid of factual support.

Additionally, the uncontroverted facts demonstrate Dickinson was treated for pain, infections, and allergies on a multitude of occasions. Thus, even if the Court were to assume that he sometimes had to choose between accessing the law library and receiving a scheduled dose of medication, there is an absence of evidence that Defendants were deliberately indifferent to any serious medical need or that he suffered lasting or serious harm because of a delay in receiving medication. The record, discussed above in connection with the other claims, shows Dickinson received or was taking medication on a continual basis, despite any doses that were missed or delayed while he was using the law library.

Dickinson has failed to meet his burden of showing a genuine issue of material fact exists regarding either the objective seriousness of the medical need or Defendants' state of mind. Therefore, summary judgment on this claim is appropriate.

IV.    **RECOMMENDATION**

The Court concludes there are no genuine issues of material fact with regard to Dickinson's claims that Defendants CMS and Shannon denied him necessary medical and psychological treatment and that these two Defendants are entitled to summary judgment on the portion of the Sixth Cause of Action for which summary judgment was previously denied. The Court therefore recommends that *Defendants Correctional Medical Services, Inc. and William Shannon's Renewed*

*Motion for Summary Judgment as to Plaintiff Kevin Dickinson's Sixth Cause of Action* [Doc. 277],

filed August 13, 2010, be granted.

_____
**DON J. SVET**
**United States Magistrate Judge**